IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

MASOUD AHMAD KHAN,                )
                                  )
          Movant,                 )
                                  )
     v.                           )     No. 1:16-cv-672 (LMB)
                                  )     Crim. No. 1:03-cr-296-2 (LMB)
                                  )
UNITED STATES OF AMERICA,         )
                                  )
          Respondent.             )

MEMORANDUM OPINION

Before the Court is Masoud Ahmad Khan's ("movant" or "Khan") Motion to Vacate

Under 28 U.S.C. § 2255 [Dkt. No. 849]. For the reasons that follow, the motion will be granted.

I.     BACKGROUND

A. **Factual Background**

On June 25, 2003, a grand jury in the Eastern District of Virginia returned an indictment

[Dkt. No. 1] charging Khan and ten other defendants with a number of offenses, all arising out of

their preparations for violent jihad overseas and, with respect to some defendants including

Khan, their travel to Pakistan to train with Laskhar-e-Taiba ("LET"), a militant group that was, at

the time, "primarily focused on defeating India's influence in Kashmir," United States v. Khan,

309 F. Supp. 2d 789, 807 (E.D. Va. 2004), aff'd in part, remanded for sentencing, 461 F.3d 477

(4th Cir. 2006). In August and September 2003, four of the co-defendants pleaded guilty and, on

September 25, 2003, a grand jury returned a 32-count superseding indictment [Dkt. No. 167]

charging Khan and the remaining six co-defendants with various offenses. After the superseding

indictment was returned, two of the co-defendants pleaded guilty and the counts against a third

co-defendant were severed for trial.  The remaining four defendants, including Khan, proceeded

to trial.

After a nine-day bench trial, the Court issued its findings of fact and conclusions of law. In brief,[1] the evidence introduced at trial established that the co-conspirators, all of whom are Muslim, met each other at different times in the late 1990s in Northern Virginia and many of their initial interactions occurred at the Dar al-Arqam Center ("Center") in Falls Church, Virginia. Khan, 309 F. Supp. 2d at 803. In January 2000, some men connected with the Center came up with the idea of creating a paintball group to "prepare for physical jihad in the sense of physical preparation for possible combat," particularly related to the then-ongoing war in Chechnya. Id. Based on the evidence introduced at trial, the Court concluded that these paintball games were "viewed as not just an opportunity for outdoor exercise, fellowship, and an opportunity to improve self-defense skills, but also as preparation for real combat." Id.[2] Both before and after the formation of the paintball group, various co-conspirators visited Pakistan to participate in LET training camps, and the group often discussed these experiences with each other.

After the September 11, 2001 attacks on the World Trade Center and the Pentagon, one of Khan's co-conspirators organized a meeting at the behest of Ali Al-Timimi ("Al-Timimi") "to address how Muslims could protect themselves" and "invited only those brothers who had participated in paintball training and owned weapons." Id. at 809. Despite Khan's lack of involvement with the paintball games, he was invited to and attended this meeting, which occurred on September 16, 2001. Id. At the beginning of the meeting, Al-Timimi told the attendees that "the gathering was an 'amana,' meaning that it was a trust that should be kept

---

[1] For the sake of brevity, the Court will not repeat all of its previous findings of facts; however, the Court adopts its extensive findings recited in Khan, 309 F. Supp. 2d 789, for the purposes of this motion.

[2] Although Khan himself did not participate in the paintball group, this history helps contextualize the interactions among the members of the conspiracy.

secret," and the group drew the window blinds and disconnected the phones from the wall. Id. at 809-10. At the meeting, Al-Timimi argued "that the September 11 attacks were justified and that the end of time battle had begun," and he urged the attendees to leave the United States and, preferably, "heed the call of Mullah Omar, leader of the Taliban, to participate in the defense of Muslims in Afghanistan and fight against United States troops that were expected to invade in pursuit of Al-Qaeda." Id. at 810. Another attendee, Randall Todd Royer ("Royer"), who had previously trained with LET and fired live rounds on the front lines in Kashmir, told the group that "anyone who wanted to fight in Afghanistan would first need to participate in military training, that the LET camps in Pakistan were a good place to receive that training, and that Royer could facilitate their entry to the LET camps." Id. at 808, 810. After this meeting, Khan and three co-conspirators agreed to travel to the LET camps for training. Id. at 810.

In preparation for their planned trip to Pakistan, Khan and his co-conspirators bought plane tickets and necessary supplies, and Royer phoned his contact in LET to provide aliases and descriptions for the men. Id. In addition, the conspirators discussed cover stories for their travel to ensure that they would not be stopped on their way to Pakistan. Id. at 810-11. After their arrivals in Karachi, Khan and his co-conspirators went to the LET office in Lahore and spent time at the LET camp together, where Khan fired an AK-47 rifle, an anti-aircraft gun, and a rocket-propelled grenade at targets, which was a part of the training plan. Id. While at the LET camp, Khan learned that Pakistan had closed its border with Afghanistan, that LET would not facilitate his travel to Afghanistan to fight with the Taliban, and that Pakistani authorities were working to remove foreigners from the training camps. Id. As a result, LET required Khan to leave, which he did in December 2001; however, before leaving the camp, he was approached by

3

two men who requested that he "return to the United States, gather information, and spread propaganda." Id.

After Khan's return to the United States, he maintained contact with LET. Specifically, Khan helped connect one of his co-conspirators, who had overstayed his visa in Pakistan, with a man known as "Abu Khalid" or "Pal Singh," who the Court found "plays a major role in LET operations." Id. at 812-14. In addition, Khan bought an airplane control module, which is a computer "that can be programmed to fly an airplane with a 10-12 foot wingspan," at Singh's request and transferred both the module and a compatible wireless video system that a co-conspirator had purchased to Singh. Id.

Based on all of the evidence presented at trial, the Court found Khan guilty of Count 1 (conspiracy in violation of 18 U.S.C. § 371), Count 2 (conspiracy to levy war against the United States in violation of 18 U.S.C. § 2384), Count 4 (conspiracy to contribute services to the Taliban in violation of 50 U.S.C. § 1705), Count 5 (conspiracy to contribute material support to LET in violation of 18 U.S.C. § 2339A), Count 11 (conspiracy to possess and use firearms in connection with a crime of violence in violation of 18 U.S.C. § 924(o)), and Counts 24, 25, and 27 (use and possession of firearms in connection with a crime of violence in violation of 18 U.S.C. § 924(c)) . With respect to each of the other counts against Khan, the Court either found him not guilty or the count was dismissed on his motion for judgment of acquittal under Fed. R. Crim. P. 29. As is relevant to the present motion, the Court found that conspiracy to provide material support to LET, conspiracy to supply services to the Taliban, and conspiracy to levy war against the United States were all crimes of violence sufficient to act as predicate offenses to support Counts 11, 24, 25, and 27. Id. at 823, 826-27. In addition, the Court found that the specific firearms-related conduct underlying these offenses involved Khan's possessing and

4

facilitating the acquisition by co-conspirators of various firearms (Count 11) and discharging an AK-47 rifle (Count 24), a 12 mm anti-aircraft gun (Count 25), and a rocket-propelled grenade (Count 27) during his trip to the LET camp. Id.

On July 29, 2005, Khan was sentenced[3] to a total of life imprisonment. [Dkt. No. 602]. This sentence consisted of concurrent sentences of 60 months on Count 1 and 120 months on each of Counts 2, 4, 5, and 11, as well as consecutive sentences of 120 months on Count 24, 300 months on Count 25, and life imprisonment on Count 27. His convictions and sentence were affirmed on appeal, and the Supreme Court denied his petition for a writ of certiorari. Khan, 461 F.3d 477, cert. denied, 550 U.S. 956 (2007).

On November 3, 2008, Khan filed a motion to vacate under 28 U.S.C. § 2255 [Dkt. No. 694], which raised a variety of challenges to his convictions and sentence. On May 12, 2011, the Court issued a Memorandum Opinion and Order granting in part and denying in part Khan's motion and vacating Count 1 because it was a lesser included offense of the Count 2 conspiracy. [Dkt. Nos. 742 & 743]. Khan's appeal of the Court's decision was dismissed. United States v. Khan, 451 F. App'x 262 (4th Cir. 2011) (per curiam).

On June 9, 2016, after receiving the appropriate authorization from the Fourth Circuit to file a second or successive 28 U.S.C. § 2255 motion [Dkt. No. 848], Khan filed the present Motion to Vacate, in which he argues that his convictions under §§ 924(c) and 924(o) should be vacated because the definition of crime of violence on which they relied is unconstitutionally vague in light of Johnson v. United States, 135 S. Ct. 2551 (2015). On December 21, 2016, the Court stayed the Motion to Vacate pending the Supreme Court's decision in Sessions v. Dimaya,

---

[3] Khan had previously been sentenced on June 15, 2004; however, before his initial appeal was briefed, the case was remanded for resentencing in light of United States v. Booker, 543 U.S. 220 (2005).

138 S. Ct. 1204 (2018). [Dkt. No. 876]. On April 17, 2018, the Supreme Court released its decision in Dimaya and, two days later, the Court unstayed the Motion to Vacate and set a briefing schedule. [Dkt. No. 883]. The Motion to Vacate has now been fully briefed and the Court finds that oral argument would not aid the decisional process.

### B. Legal Background

Under 18 U.S.C. § 924(c):

> Except to the extent that a greater minimum sentence is otherwise provided by this subsection or by any other provision of law, any person who, during and in relation to any crime of violence or drug trafficking crime (including a crime of violence or drug trafficking crime that provides for an enhanced punishment if committed by the use of a deadly or dangerous weapon or device) for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime—
> (i) be sentenced to a term of imprisonment of not less than 5 years;
> (ii) if the firearm is brandished, be sentenced to a term of imprisonment of not less than 7 years; and
> (iii) if the firearm is discharged, be sentenced to a term of imprisonment of not less than 10 years.

18 U.S.C. § 924(c)(1)(A). Section 924(c) also provides a definition of the term "crime of violence" for purposes of that section:

> [T]he term "crime of violence" means an offense that is a felony and—
> (A) has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or
> (B) that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

18 U.S.C. § 924(c)(3). The two prongs of this definition are commonly referred to as the "force clause" and the "residual clause" respectively. This provision is not the only place in the United States code where a similar definition appears. Using nearly identical language, 18 U.S.C. § 16 provides:

> The term "crime of violence" means—

6

(a) an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or
(b) any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

18 U.S.C. § 16.[4] Similarly, 18 U.S.C. § 924(e)[5] defines the term "violent felony" as

any crime punishable by imprisonment for a term exceeding one year, or any act of juvenile delinquency involving the use or carrying of a firearm, knife, or destructive device that would be punishable by imprisonment for such term if committed by an adult, that—
(i) has as an element the use, attempted use, or threatened use of physical force against the person of another; or
(ii) is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another.

18 U.S.C. § 924(e)(2)(B).

The current Motion to Vacate rests on two Supreme Court cases respectively addressing § 924(e) and § 16: Johnson v. United States, 135 S. Ct. 2551 (2015), and Sessions v. Dimaya, 138 S. Ct. 1204 (2018). In Johnson, the Supreme Court considered a due process vagueness challenge to the portion of § 924(e) defining a violent felony as a crime that "otherwise involves conduct that presents a serious potential risk of physical injury to another" (the "ACCA residual clause"). See Johnson, 135 S. Ct. at 2555. Although the Supreme Court had previously decided four different cases each involving the application of the ACCA residual clause to a specific state crime and had "rejected suggestions by dissenting Justices" in two of those cases that the ACCA

---

[4] Section 16 does not itself criminalize any conduct or prescribe any enhanced punishments related to crimes of violence. Instead, § 16 provides a generic definition of "crime of violence" that is incorporated into various other provisions of the United States code. See, e.g., 8 U.S.C. § 1101(a)(43) (defining "aggravated felony" for the purposes of immigration removal to include any "crime of violence (as defined in [§ 16], but not including a purely political offense) for which the term of imprisonment [sic] at least one year"); 18 U.S.C. § 25 (incorporating § 16 in criminalizing the use of a minor to commit a "crime of violence").

[5] Section 924(e), which is referred to as the Armed Career Criminal Act ("ACCA"), provides for a mandatory minimum sentence of fifteen years imprisonment for any individual who is convicted of unlawful possession of a firearm in violation of 18 U.S.C. § 922(g) and who has three previous convictions for violent felonies and/or serious drug offenses.

residual clause violated "the Constitution's prohibition of vague criminal laws," id. at 2556, the

Johnson Court reversed course, holding that "the indeterminacy of the wide-ranging inquiry

required by the residual clause both denies fair notice to defendants and invites arbitrary

enforcement by judges" and that increasing "a defendant's sentence under the clause denies due

process of law," id. at 2557.

As the Supreme Court explained, the ACCA residual clause required courts to use a

framework known as the ordinary-case approach when determining whether a previous

conviction of a particular state or federal crime qualified as a conviction of a violent felony.

Under this framework, courts were required "to picture the kind of conduct that the crime

involves in the ordinary case, and to judge whether that abstraction presents a serious potential

risk of physical injury." Id. (internal quotation marks omitted). In determining that the ACCA

residual clause was unconstitutionally vague, the Court specifically described problems

generated by four aspects of this inquiry.

First, the Court observed that the ACCA residual clause "leaves grave uncertainty about

how to estimate the risk posed by a crime" because "assessing 'potential risk' seemingly requires

the judge to imagine how the idealized ordinary case of the crime subsequently plays out" but the

statute provides no guidance on how to determine what the "ordinary case" of a given crime

includes. Id. at 2557-58. As examples, the Court explained that it is unclear whether the ordinary

case of witness tampering involves offering a witness a bribe or threatening a witness with

violence or whether the ordinary case of attempted burglary involves a would-be burglar being

confronted by a police officer, security guard, or homeowner or simply a homeowner "yelling

'Who's there?' from his window, and the burglar's running away." Id. (internal quotation marks

omitted). The Court further explained that the statute provided no guidance on how to determine

8

which of various potential alternatives represents the ordinary case: "A statistical analysis of the state reporter? A survey? Expert evidence? Google? Gut instinct?" Id. at 2557 (internal quotation marks omitted).

Second, the Court observed that the ACCA residual clause left "uncertainty about how much risk it takes" for this ill-defined "ordinary case" of a crime "to qualify as a violent felony." Id. at 2558. The indeterminacy of this risk threshold was heightened by the provision's structure, which "force[d] courts to interpret 'serious potential risk' in light of the four enumerated crimes—burglary, arson, extortion, and crimes involving the use of explosives," which themselves are "far from clear in respect to the degree of risk each poses." Id. (internal quotation marks omitted).

Third, the Court observed that the ACCA residual clause did not limit the inquiry to risks posed by even the stylized ordinary defendant's conduct in the commission of the offense but instead forced courts to consider how the aftermath of the ordinary offense might play out. As the Court explained, "the inclusion of burglary and extortion among the enumerated offenses preceding the residual clause confirms that the court's task also goes beyond evaluating the chances that the physical acts that make up the crime will injure someone" because the risk of injury in such cases "arises because the extortionist might engage in violence after making his demand or because the burglar might confront a resident in the home after breaking and entering." Id. at 2557. This lack of a nexus requirement or temporal limitation only heightened the uncertainty involved in evaluating the risks posed by any given offense.

Lastly, the Court surveyed previous decisions attempting to apply the ACCA residual clause and found that the Supreme Court's "repeated attempts and repeated failures to craft a principled and objective standard out of the residual clause confirm its hopeless indeterminacy."

Id. at 2558. For example, in each of the three cases where the Supreme Court had "concentrated on the level of risk posed by the crime in question," the Court had "found it necessary to resort to a different ad hoc test to guide [its] inquiry." Id. These tests included asking whether the risk posed by the crime in question was "comparable" to the risk posed by the closest analog among the enumerated offenses, using a statistical report prepared by the Sentencing Commission to analyze the level of risk posed by the crime in question, and relying on a combination of "common sense" and statistical evidence to assess the degree of risk posed by the crime. Id. at 2558-59. In the fourth Supreme Court case applying the residual clause, the Court had taken "an entirely different approach," asking whether the crime in question resembled the enumerated offenses "in kind," rather than in "degree[,] of risk posed." Id. at 2559 (internal quotation marks omitted). Moreover, looking beyond its own cases, the Supreme Court acknowledged that the ACCA residual clause had created "numerous splits among the lower federal courts" both about "whether the residual clause covers this or that crime" and about "the nature of the inquiry one is supposed to conduct and the kinds of factors one is supposed to consider." Id. at 2560 (internal quotation marks omitted).  Taking these factors together, the Supreme Court concluded that the ACCA residual clause was unconstitutionally vague.

In the wake of this decision, the lower federal courts began to split over whether the nearly identical residual clauses in § 16 and § 924(c), both of which shared some—but not all—of the features of the ACCA residual clause at issue in Johnson, were also unconstitutionally vague. In Dimaya, the Supreme Court resolved this split with respect to § 16, holding that § 16(b) "suffers from the same constitutional defect" identified in Johnson. Dimaya, 138 S. Ct. at 1210.

In particular, the Dimaya Court read Johnson as relying on two specific features of the ACCA residual clause to find it unconstitutionally vague: "'By combining indeterminacy about how to measure the risk posed by a crime with indeterminacy about how much risk it takes for the crime to qualify as a violent felony, the residual clause' violates the guarantees of due process." Id. at 1214 (quoting Johnson, 135 S. Ct. at 2558). According to the Court, § 16(b) "has the same two features . . . , combined in the same constitutionally problematic way." Id. at 1213. First, as with the ACCA residual clause, § 16(b) calls for an ordinary-case analysis and, because the "ordinary case" of a given crime remains an "inscrutable thing," § 16(b) does not provide a clear way to measure the risk posed by a given crime. Second, as with the ACCA residual clause, § 16(b) employs an uncertain risk threshold ("substantial risk") that, when applied to "an idealized ordinary case of the crime[,] . . . ceases to work in a way consistent with due process." Id. at 1215-16 (internal quotation marks omitted).

Accordingly, the Dimaya Court held that § 16(b) was unconstitutionally vague, and, armed with these two decisions, Khan now contends that § 924(c)(3)(B),[6] which is worded almost identically to § 16(b), is also unconstitutionally vague.

## II.    DISCUSSION

The government argues that consideration of the Motion to Vacate is barred by a variety of procedural obstacles, and also fails on the merits because § 924(c)(3)(B) should be reinterpreted in accordance with principles of constitutional avoidance rather than struck down. Lastly, it argues that under its interpretation of § 924(c), Khan's predicate offenses remain

---

[6] Although one of the convictions that Khan is challenging is under 18 U.S.C. § 924(o), not § 924(c), § 924(o) incorporates § 924(c): "A person who conspires to commit an offense under subsection (c) shall be imprisoned for not more than 20 years, fined under this title, or both; and if the firearm is a machine gun or destructive device, or is equipped with a firearm silencer or muffler, shall be imprisoned for any term of years or life." Therefore, any analysis of the constitutionality and appropriate interpretation of § 924(c) applies equally to § 924(o).

11

crimes of violence, and therefore his Motion to Vacate should be dismissed. The Court will address each argument in turn.

### A. <u>Timeliness Under 28 U.S.C. § 2255(f)(3)</u>

The government first argues that the Motion to Vacate is untimely. In general, for a motion under § 2255 to be timely, it must be filed within one year of the date that the movant's conviction became final; however, "courts will consider a [§ 2255] motion timely if (1) [the movant] relies on a right recognized by the Supreme Court after his judgment became final, (2) he files a motion within one year from 'the date on which the right asserted was initially recognized by the Supreme Court,'" and (3) the right has been made retroactively applicable. <u>United States v. Brown</u>, 868 F.3d 297, 301 (4th Cir. 2017) (quoting 28 U.S.C. § 2255(f)). Because there is no question that movant's motion was filed more than one year after Khan's conviction became final, the motion is timely only if he is asserting a right that has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review. According to the government, the motion is untimely under this provision because it is based on a "right regarding the constitutionality of § 924(c)(3)(B)" that has not yet been recognized by the Supreme Court. This argument is unpersuasive.

In <u>Brown</u>, the Fourth Circuit recently explored the question of what it means for a § 2255 motion to rely on a right recognized by the Supreme Court. There, the movant argued that his sentence, which was imposed pursuant to the then-mandatory Sentencing Guidelines, was unconstitutional because the relevant guideline range had been enhanced by Brown's designation as a career offender under a provision similar to the ACCA residual clause that was invalidated in <u>Johnson</u>. To support his argument, the movant "urge[d] th[e] court to cobble together a right by combining <u>Johnson</u>'s reasoning with that of two other Supreme Court cases," <u>United States v.</u>

12

Booker, 543 U.S. 220 (2005), which "recognized a constitutional distinction between mandatory

Sentencing Guidelines and advisory Sentencing Guidelines," and Beckles v. United States, 137

S. Ct. 886 (2017), which held that the advisory Sentencing Guidelines are not subject to

vagueness challenges but, in so doing, "carefully limited its holding to the advisory Sentencing

Guidelines, thus, in [Brown's] view, leaving open the question of whether defendants could

challenge sentences imposed under the mandatory Sentencing Guidelines as void for vagueness."

Id. at 302 (emphasis in original). Combining the premise from Booker, the reasoning from

Johnson, and the explicit limitation in Beckles, Brown argued "that the mandatory Sentencing

Guidelines cabined a sentencing judge's discretion in a manner that raises the same concerns

animating the Supreme Court's decision in Johnson: denying fair notice to defendants and

inviting arbitrary enforcement by judges." Id.

      The Fourth Circuit rejected Brown's argument and held that he did not appropriately

assert a new right that had been recognized by the Supreme Court. According to the court's

majority opinion, "a Supreme Court case has 'recognized' an asserted right within the meaning

of § 2255(f)(3) if it has formally acknowledged that right in a definite way." Id. at 301. On the

other hand, "if the existence of a right remains an open question as a matter of Supreme Court

precedent, then the Supreme Court has not 'recognized' that right." Id. The court concluded that

Brown had not shown that Johnson had recognized the right in question for two reasons. First, as

Brown himself had conceded, the Beckles Court "carefully crafted its holding to avoid deciding

whether the logic of Johnson applied outside the context of [the] ACCA," which "confirm[ed]

that the Supreme Court has yet to recognize a broad right invalidating all residual clauses as void

for vagueness simply because they exhibit wording similar to ACCA's residual clause." Id. at

302. Second, Beckles had left open "the question of whether defendants could challenge

sentences imposed under the mandatory Sentencing Guidelines as void for vagueness," which

meant that the Supreme Court had explicitly refused to recognize the right asserted by Brown in

Beckles. Id. Accordingly, the majority held that Brown's motion was untimely under

§ 2255(f)(3) in light of "the narrow nature of Johnson's binding holding," as well as "Beckles's

indication that the position advanced by [Brown] remains an open question in the Supreme

Court." Id. at 303.[7]

The government argues that similar logic applies to the Motion to Vacate because

"neither the plurality opinion in Dimaya nor Justice Gorsuch's concurrence said anything about

§ 924(c)." Gov't Opp. 8. Indeed, the only mention of § 924(c) in Dimaya came in Chief Justice

Roberts's dissent, which recognized that:

> § 16 serves as the universal definition of "crime of violence" for all of Title 18 of the
> United States Code. Its language is incorporated into many procedural and
> substantive provisions of criminal law, including provisions concerning racketeering,
> money laundering, domestic violence, using a child to commit a violent crime, and
> distributing information about the making or use of explosives. See 18 U.S.C.
> §§ 25(a)(1), 842(p)(2), 1952(a), 1956(c)(7)(B)(ii), 1959(a)(4), 2261(a), 3561(b). Of
> special concern, § 16 is replicated in the definition of "crime of violence" applicable
> to § 924(c), which prohibits using or carrying a firearm "during and in relation to any
> crime of violence," or possessing a firearm "in furtherance of any such crime."
> §§ 924(c)(1)(A), (c)(3). Though I express no view on whether § 924(c) can be
> distinguished from the provision we consider here, the Court's holding calls into
> question convictions under what the Government warns us is an "oft-prosecuted
> offense."

Dimaya, 138 S. Ct. at 1241 (Roberts, C.J., dissenting). Moreover, the government observes that

Dimaya did not hold that language like that in § 16(b) and § 924(c)(3)(B) requires a categorical

---

[7] In dissent, Chief Judge Gregory explained that, in his view, "a newly recognized right is more
sensibly read to including the reasoning and principles to explain it" and Johnson "recognized a
defendant's right not to have his or her sentence fixed by the application of the categorical
approach to an imprecise and indeterminate sentencing provision." See Brown, 868 F.3d at 304
(Gregory, C.J., dissenting). Based on the combination of his more flexible reading of
§ 2255(f)(3) and his more abstract interpretation of Johnson, he would have found that Brown
was asserting a right recognized in Johnson and would have allowed the claim to proceed.

14

approach rather than a conduct-specific approach and argues that § 924(c)(3)(B) is

distinguishable from § 16(b) because, as is discussed below, "the government now contends"

that "the better reading of § 924(c)(3)(B) is under a conduct-specific" approach. Gov't Opp. 9.

Accordingly, the government argues that "<u>Dimaya</u> does not, by itself, entitle [Khan] to relief"

and that any "reliance on <u>Dimaya</u> in this context would have to turn on the purported similarity

between § 924(c)(3)(B) and § 16(b)," which analogical reasoning is "foreclose[d]" by <u>Brown</u>. <u>Id.</u>

at 8.[8]

    To the contrary, under the logic of <u>Brown</u>, Khan's motion is timely. The <u>Brown</u> decision

was premised on the unique circumstances of that case, in which the movant attempted to rely on

the confluence of three Supreme Court cases, one of which had explicitly left open the question

his petition presented. Unlike Brown's § 2255 motion, Khan's motion relies on a simple

application of the rule announced in <u>Dimaya</u> to the nearly identical provision in § 924(c), which

---

[8] The government also argues that the Motion to Vacate is not timely if "reasonable jurists" may disagree about the appropriate resolution of the motion. Gov't Opp. 5-6 (citing <u>Chaidez v. United States</u>, 568 U.S. 342, 347 (2013)). This argument begins with the correct premise that determining whether a particular Supreme Court case recognizes a "new" right involves applying the framework developed by the Supreme Court in <u>Teague v. Lane</u>, 489 U.S. 288, 301 (1989), which holds that "a case announces a new rule if the result was not dictated by precedent existing at the time the defendant's conviction became final." <u>See</u> <u>United States v. Powell</u>, 691 F.3d 554, 557-58 (4th Cir. 2012). Without any intermediate steps, it ends in the incorrect conclusion that the movant's motion is not timely if the result is not "dictated" by <u>Dimaya</u> or <u>Johnson</u>.

To understand where the slippage in this argument occurs requires breaking down the inquiry under § 2255(f)(3). The plain language of this provision requires the Court to determine both whether the Supreme Court case in question "initially recognized" a right and also whether the movant "assert[s]" this right. The government's argument improperly mixes these two inquiries because the premise refers to the first inquiry and the conclusion to the second. Although the <u>Teague</u> framework is appropriately applied to determine whether a particular case "newly" recognizes a given right or merely applies a right that was recognized in an earlier case, it is not the appropriate test for determining whether a given § 2255 motion is asserting a particular right. To put this in concrete terms, the <u>Teague</u> framework would be used to determine whether <u>Dimaya</u> recognizes a new right (if the government had argued that it does not). It should not be applied to determine whether movant's § 2255 motion relies on the right recognized in <u>Dimaya</u>.

15

the Fourth Circuit has traditionally interpreted in tandem with § 16(b). See In re Hubbard, 825

F.3d 225, 230 n.3 (4th Cir. 2016) ("We note, however, that the language of § 16(b) is identical to

that in § 924(c)(3)(B), and we have previously treated precedent respecting one as controlling

analysis of the other.").

Moreover, when Brown was decided, the Fourth Circuit interpreted Johnson as a

"narrow" decision that applied only to the context of the ACCA and not to other residual clauses.

See Brown, 868 F.3d at 302-03. By contrast, Dimaya makes clear that its holding is not so

restricted but instead applies to invalidate any provision that possesses "an ordinary-case

requirement and an ill-defined risk threshold." See Dimaya, 138 S. Ct. at 1223. The Dimaya

Court's repeated references to these two features, and its holding that "minor linguistic

disparities" between statutes that share these features do not "make[] any real difference," id.,

clearly and formally recognize a due process right not to be deprived of one's life, liberty, or

property (whether through conviction, sentencing, deportation, or otherwise) pursuant to any

provision that includes these features. Khan asserts that the residual clause of § 924(c), under

which he was convicted, is unconstitutionally vague because it includes both an ordinary-case

requirement and an ill-defined risk threshold. Accordingly, the Motion to Vacate asserts a right

under Dimaya and is timely under § 2255(f)(3).

Furthermore, contrary to what the government appears to argue, the Motion to Vacate is

not rendered untimely merely because the government has a reasonable argument that, as a

matter of constitutional avoidance, § 924(c) should be reinterpreted to dispense with the

ordinary-case requirement[9] and the motion should be denied on the merits. As the Seventh

---

[9] Indeed, the government's substantive argument that § 924(c) should be reinterpreted as a matter
of constitutional avoidance highlights that Khan's motion is not premature because that argument

Circuit has explained, although with respect to a different provision, the "government's approach suffers from a fundamental flaw" because it "improperly reads a merits analysis into the limitations period." Cross v. United States, 892 F.3d 288, 293 (7th Cir. 2018).The plain language of § 2255(f)(3) provides only that a movant must assert, or "claim the benefit of," a newly recognized right; however, under the government's framing of the inquiry, § 2255(f)(3) would only apply if the Supreme Court had directly held that the provision at issue was unconstitutional. Id. at 293-94. This would improperly change § 2255(f)(3) from requiring the movant to "assert" a right under a given case to requiring, as a threshold matter, "that the movant must ultimately prove that the right applies to his situation." Id. at 294; see also United States v. Meza, No. CR 11-133, 2018 WL 2048899, at *6 (D. Mont. May 2, 2018), appeal filed, No. 18-35478 (9th Cir.) ("[T]he [government's] argument needlessly entangles the question of when to file with the decision as to whether the movant actually has the right he asserts. And to what end? If the filing is timely, it is meritorious. If it lacks merit, it is untimely. This leaves the limitations period with no work to do. Statutes of limitation are not generally redundant with the merits of a claim in this way.").

In addition, the problematic consequences that would flow from accepting the government's argument are highlighted by the portion of Chief Justice Roberts's dissent that is quoted above, which explains that "the language of § 16(b) is incorporated or repeated in numerous places in the U.S. Code." Meza, 2018 WL 2048899, at *5. The government's argument would seem to require that the Supreme Court decide a case applying the Johnson/Dimaya rule to each of these statutory provisions before a defendant convicted under that provision may file a § 2255 motion. See id. This result would untenably impair judicial

---

is an implicit concession that, in light of Dimaya, there are serious constitutional questions about whether § 924(c)(3)(B) is impermissibly vague, at least as it has traditionally been interpreted.

economy and leave many federal prisoners convicted under potentially unconstitutional provisions languishing in prison with no meaningful opportunity to contest their convictions. Not only is such a result fundamentally unfair, it does not comport with the purpose of the § 2255(f) limitations scheme. Congress "intended the statute of limitations 'to eliminate delays in the federal habeas review process,' not to create them." Id. (citation omitted) (quoting Holland v. Florida, 560 U.S. 631, 648 (2010)).

Lastly, this determination is in accord with many of the federal district courts that have addressed § 2255 motions presenting vagueness challenges to § 924(c) convictions in light of Dimaya, including some courts that have denied the motion despite allowing it to proceed under § 2255(f)(3). See, e.g., United States v. Brown, Crim. No. 11-15-2, 2018 WL 2171450 (W.D. La. May 10, 2018); Meza, 2018 WL 2048899; United States v. Flores, No. 2:08-cr-163, 2018 WL 2709855 (D. Nev. June 5, 2018); Russaw v. United States, No. 2:15-cv-8146, 2018 WL 2337301 (N.D. Ala. May 23, 2018); United States v. Lal, No. 2:12-cr-193, 2018 WL 2222720 (D. Nev. May 15, 2018); Otero v. United States, No. 10-cr-743, 2018 WL 2224990 (E.D.N.Y. May 15, 2018).

Accordingly, Khan's motion, which was filed within one year of both Johnson and Dimaya, is timely under § 2255(f)(3).

## B. Facial Vagueness Challenge

Next, the government argues that Khan may not bring a facial challenge to § 924(c)(3)(B) because "[o]utside of the First Amendment context, a person 'who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others.'" Gov't Opp. 10-11 (quoting Holder v. Humanitarian Law Project, 561 U.S. 1, 18-19 (2010)). According to the government, Khan's conduct "clearly falls within the 'core' of §

18

924(c)(3)(B)" because it "involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense." Id. at 11 (quoting 18 U.S.C. § 924(c)(3)(B)). As such, the government argues that Khan cannot challenge § 924(c)(3)(B) as void for vagueness.

Whatever merit the government's argument may have in other contexts, Johnson and Dimaya foreclose its application here for three reasons. First, in both cases, the Supreme Court did not engage in any discussion of whether Johnson's or Dimaya's specific underlying offense[10] fell within the "core" of the statute but instead allowed Johnson and Dimaya to bring their facial constitutional challenges without any regard to the relationship between their specific offenses and the residual clause in question.[11] Accordingly, the Supreme Court has at least implicitly rejected the idea that only individuals whose underlying offenses are not at the "core" of the residual clause may bring a facial vagueness challenge to the statute.

Second, in both cases, the Supreme Court did not interpret the residual clause in question narrowly to allow it to apply constitutionally to a "core" group of offenses. Instead, the Court held that the entire residual clause is void for vagueness and, therefore, is wholly unenforceable. This categorical holding suggests that, at least with respect to statutes that share the problematic features of the residual clauses in § 16(b) and § 924(e), the appropriate mode of analysis focuses

---

[10] Both decisions merely mention the underlying offense in passing. In Johnson, the defendant, who was described as a "felon with a long criminal record" with ties to white supremacist organizations, had told undercover agents that he had manufactured explosives and planned to attack various sites. He was convicted of the Minnesota state offense of unlawful possession of a short-barreled shotgun. Johnson, 135 S. Ct. at 2556. In Dimaya, the alien was twice convicted of first-degree burglary under California law. Dimaya, 138 S. Ct. at 1209.

[11] Indeed, in Dimaya, Justice Thomas explicitly argued in dissent that "outside the First Amendment context, a challenger must prove that the statute is vague as applied to him" and that "§ 16(b) is not vague as applied to" Dimaya. Dimaya, 138 S. Ct. at 1250 (Thomas, J., dissenting). The Court's implicit rejection of this argument provides even stronger assurances that, whatever the limits of this rule, it does not apply to an individual bringing a vagueness challenge to a statute like § 16(b) or § 924(c)(3)(B).

on the vagueness of the statute as a whole rather than on whether any specific offense clearly

falls within its ambit. Because the Court must analyze the clause as a whole and Khan was

convicted under § 924(c), he has standing to bring his constitutional challenge.[12]

Lastly, even if the government were correct that Khan would only have standing to

challenge the constitutionality of the residual clause if his conduct fell outside of the "core" of

§ 924(c)(3)(B), Khan's motion could still proceed. As is discussed below, Khan's specific

conduct did not involve "a substantial risk that physical force against the person or property of

another may be used in committing the offense," which means that his actual conduct was not

within the "core" group of conduct encompassed by the statute and Khan may challenge the

constitutionality of § 924(c)(3)(B).

### C. Analysis Under § 924(c)(3)(A)

The government next argues that Khan's § 924(c) convictions should not be vacated

because his three predicate crimes—conspiracy to provide material support to LET, conspiracy

---

[12] This conclusion is reinforced by the Johnson majority and Justice Gorsuch's Dimaya concurrence, both of which engage with the government's argument in those cases that there "will be straightforward cases under the residual clause, because some crimes clearly pose a serious potential risk of physical injury to another." Johnson, 135 S. Ct. at 2560. As those opinions explain, many offenses that seem "easy turn out not to be so easy after all." Id. For example, in Johnson, the government offered as an "easy" case Connecticut's offense of "rioting at a correctional institution," which "certainly sounds like a violent felony—until one realizes that Connecticut defines this offense to include taking part in 'any disorder, disturbance, strike, riot, or other organized disobedience to the rules and regulations' of the prison." As the Court observed, it is unclear whether "ordinary" prison "disorder" involves "a full-fledged prison riot, a food-fight in the prison cafeteria, or a passive and nonviolent act such as disregarding an order to move." Id. (internal quotation marks and alteration omitted). Similarly, Justice Gorsuch observed in Dimaya that it is unclear whether "a conviction for witness tampering ordinarily involve[s] a threat to the kneecaps or just the promise of a bribe" or whether "a conviction for kidnapping ordinarily involve[s] throwing someone into a car trunk or a noncustodial parent picking up a child from daycare." Dimaya, 138 S. Ct. at 1232 (Gorsuch, J., concurring in part and concurring in the judgment). As these examples demonstrate, even if the government were correct that a defendant whose predicate offense falls within the "core" of § 924(c)(3)(B) should not be able to bring a facial challenge to the residual clause, it is not at all obvious whether any particular offense falls within this claimed "core."

to supply services to the Taliban, and conspiracy to levy war against the United States—all qualify as crimes of violence under the force clause, § 924(c)(3)(A), the constitutionality of which is not called into question by <u>Johnson</u> or <u>Dimaya</u>. Under the force clause, any felony offense that "has as an element the use, attempted use, or threatened use of physical force against the person or property of another" is a "crime of violence." According to the government, Khan's predicate offenses fall under this clause because "[o]ne definition of 'threaten' is 'to give signs or warning of,' or 'to portend,'" and when two or more people engage in an agreement to provide material support or services to a foreign terrorist organization or to make war against the United States, "that agreement, without more, 'portends' the use of force, because the existence of the conspiracy makes the occurrence of the conspiracy's object far more likely." Gov't Mem. 14. This argument is unpersuasive.

As is obvious from the plain language of the force clause, analyzing whether a particular offense falls within its ambit requires the Court to focus on "the statutory definition of the offense." <u>United States v. Fuertes</u>, 804 F.3d 485, 498 (4th Cir. 2015) (internal quotation marks and alterations omitted). In particular, the Court must examine the "element[s]" of the claimed predicate offenses and determine whether any element necessarily involves "the use, attempted use, or threatened use of physical force against the person or property of another." 18 U.S.C. § 924(c)(3)(A). The elements of Count 2, conspiracy to levy war against the United States "are: 1) a conspiracy, 2) to overthrow, put down, or to destroy by force the Government of the United States, or to levy war against them, or to oppose by force the authority thereof, or by force to prevent, hinder, or delay the execution of any law of the United States, or by force to seize, take, or possess any property of the United States contrary to the authority thereof." <u>Khan</u>, 309 F. Supp. 2d at 820. The elements of Count 4, conspiracy to contribute services to the Taliban, "are:

21

1) a conspiracy, 2) to willfully make or receive any contribution of funds, goods, or services, to or for the benefit of the Taliban." Id. The "elements of Count 5, conspiracy to provide material support to LET, are: 1) a conspiracy; 2) to provide material support or resources or conceal or disguise the nature, location, source, or ownership of material support or resources; 3) knowing or intending that they are to be used in preparation for, or in carrying out, a violation of 18 U.S.C. § 956." Id. at 821.

Merely reading the elements of each of the claimed predicate offenses is sufficient to demonstrate that none of the three conspiracy offenses is covered by the force clause. Neither predicate offense requires, as an element, that a violator of the statute use force, attempt to use force, or threaten to use force.[13] The government's argument that a violation of each statute necessarily involves the "threatened" use of force because such a conspiracy "portends" the future use of force by making such a use "more likely" does not alter this straightforward analysis for three reasons. First, although one way to define "to threaten" may be "to portend" (e.g., "the clouds threatened rain"), see "Threaten," American Heritage College Dictionary (3d ed. 2000), it is clear from the context of § 924(c)(3)(A) that this is not the sense in which Congress used the word in the force clause. Instead, a "threatened" use of force involves a situation where a defendant's "conduct and words were calculated to create the impression" that the defendant may imminently use force. United States v. Jones, 932 F.2d 624, 625 (7th Cir. 1997) (cited in United States v. McNeal, 818 F.3d 141, 153 (4th Cir. 2016)); see also "Threat,"

---

[13] Although the object of the conspiracy encompassed by Count 2 necessarily involves force, a conviction under the conspiracy offense does not itself require that the defendant have necessarily used force because the agreement supporting the conspiracy may terminate before such force is ever employed, or is even imminent. As is demonstrated by the present case, a defendant may commit the offense of conspiracy to levy war against the United States without ever using, attempting to use, or threatening to use force, which is sufficient to remove this offense from the ambit of the force clause.

22

Black's Law Dictionary (8th ed. 2004) (defining a "threat" as a "communicated intent to inflict harm or loss on another"). The claimed predicate offenses here clearly do not have as an element any such "threatened use" of force. Second, the government's interpretation of "threaten" raises its own constitutional problems. As the Supreme Court explained in Johnson, one of the predominant features of the ACCA residual clause that gave rise to its unconstitutional indeterminacy was that it did not limit the risk-of-force analysis to the conduct surrounding the elements of the crime but instead required courts to "imagine" how a stylized version "of the crime subsequently plays out." Johnson, 135 S. Ct. at 2557-58. The government's proposed definition of "threaten" falls into the same trap, asking the Court to determine whether a violation of one of the predicate offenses necessarily leads to a sequence of events that "portends" the use of force at some indeterminate point in the future. As Johnson made clear, the Court must reject such an invitation. Third, even if the government's definitions of "threaten" and "portend" were correct, the inchoate nature of the conspiracy offenses at issue here would still not necessarily "portend" the use of force by the defendant. Because no more than an agreement to engage in the relevant conduct is required to establish a violation of any of the predicate offense statutes, even if the defendant does not pursue the agreement any further or engage in any overt act in furtherance of the agreement, it is possible for a defendant to commit each predicate offense without in any way "portending" the future use of force.

Accordingly, it is clear that none of the claimed conspiracy predicate offenses involved in this case "has as an element the use, attempted use, or threatened use of physical force against the person or property of another," 18 U.S.C. § 924(c)(3)(A), and therefore none of the predicate offenses qualifies as a crime of violence under the force clause.

### D. Analysis Under § 924(c)(3)(B)

The government's final argument is that the Court should reinterpret the residual clause to avoid the constitutional problems identified by Dimaya and Johnson and that under this reinterpretation, defendant's predicate offenses qualify as crimes of violence. For the reasons given below, the Court agrees with the government that the residual clause should be reinterpreted; however, the Court finds that even under the proper interpretation of the residual clause, Khan's predicate offenses do not qualify as crimes of violence.

As previously discussed, § 924(c)(3)(B), the residual clause, defines as a crime of violence any "offense that is a felony" and "that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense." This language has previously been interpreted by both the Fourth Circuit and other courts to require an "ordinary-case" categorical approach, where the relevant question is whether the "ordinary case" of the predicate crime committed by the defendant (e.g., the "ordinary" bank robbery in violation of 18 U.S.C. § 2113(a)) "by its nature" involves a "substantial risk that physical force against the person or property of another may be used in the course of committing the offense." See United States v. Fuertes, 805 F.3d 485 (4th Cir. 2015); see also, e.g., United States v. Acosta, 470 F.3d 132 (2d Cir. 2006) (per curiam); United States v. Williams, 343 F.3d 423 (5th Cir. 2003); Taylor v. United States, 814 F.3d 340 (6th Cir. 2016); United States v. Moore, 38 F.3d 977 (8th Cir. 1994); United States v. Amparo, 68 F.3d 1222 (9th Cir. 1995); United States v. Serafin, 562 F.3d 1105 (10th Cir. 2009); United States v. Maguire, 706 F.3d 1333 (11th Cir. 2013); United States v. Kennedy, 133 F.3d 53 (D.C. Cir. 1998).

This ordinary case approach was also used in evaluating whether a conviction was encompassed by the residual clauses of § 16(b) as incorporated into the INA and § 924(e) before

24

those provisions were declared void for vagueness, and the inherent difficulty in determining the contours of the "ordinary" case of a given crime was a critical factor underlying the Supreme Court's holdings in Johnson and Dimaya. See Johnson, 135 S. Ct. at ("Two features of the residual clause conspire to make it unconstitutionally vague. In the first place, the residual clause leaves grave uncertainty about how to estimate the risk posed by a crime. It ties the judicial assessment of risk to a judicially imagined 'ordinary case' of a crime . . . . At the same time, the residual clause leaves uncertainty about how much risk it takes for a crime to qualify as a violent felony."); Dimaya, 138 S. Ct. at 1223 (concluding that because § 16(b) involved "both an ordinary-case requirement and an ill-defined risk threshold, it necessarily 'devolv[ed] into guesswork and intuition,' invited arbitrary enforcement, and failed to provide fair notice" (alteration in original) (quoting Johnson, 135 S. Ct. at 2557)).

As Khan argues, and as the government appears to recognize, under the rule announced in Dimaya, applying the ordinary-case approach to determine whether a predicate offense is encompassed by § 924(c)(3)(B) produces an unconstitutional result because it involves "both an ordinary-case requirement" and the same "ill-defined risk threshold" as § 16(b), rendering it unconstitutionally vague for precisely the same reasons as the Supreme Court articulated in Dimaya. In view of the "serious constitutional questions" raised about the ordinary-case approach in light of Dimaya, the government urges the Court to "construe Section 924(c)(3)(B) to require that the classification of an offense as a 'crime of violence' under that provision be based on the defendant's actual conduct in that case," and not on the ordinary-case requirement. Gov't Opp. 15. Under this conduct-specific approach, § 924(c)(3)(B) would avoid the vagueness and uncertainty concerns underlying the Johnson and Dimaya decisions.

In general, a court is "obligated to construe [a] statute to avoid" any "serious constitutional problems" as long as "an alternative interpretation of the statute is fairly possible." INS v. St. Cyr, 533 U.S. 289, 299-300 (2001) (internal quotation marks omitted). In this case, there are, as discussed above, serious constitutional problems with § 924(c)(3)(B) if the ordinary-case approach is used to determine whether the predicate offense qualifies as a crime of violence. Accordingly, this Court's task is not to determine whether § 924(c)(3)(B) is better read to incorporate the ordinary-case approach or the conduct-specific approach. Instead, the Court must determine whether it is "fairly possible" to construe § 924(c)(3)(B) as implementing the conduct-specific approach.[14]

Turning to the text of the residual clause, this provision defines a "crime of violence" as any "offense that is a felony" and "that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense." Based on this definition, the critical word to interpret is "offense," and where the government and movant disagree is about whether the word "offense" can fairly be read to refer to the specific criminal act committed by a defendant rather than to the generic crime for which

---

[14] Khan argues that interpreting § 924(c)(3)(B) to require a conduct-specific approach is foreclosed by Fourth Circuit precedent, which has applied the ordinary-case approach to § 924(c)(3)(B) in the past. See Mov. Reply 5-6 (citing United States v. Fuertes, 805 F.3d 485, 498 (4th Cir. 2015); and United States v. McNeal, 818 F.3d 141, 152 (4th Cir. 2016)). Although the Fourth Circuit has previously used the ordinary-case approach in applying § 924(c)(3)(B), it did so before Dimaya brought to light the constitutional concerns with such an interpretation. Accordingly, at the most, these Fourth Circuit cases stand for the proposition that the ordinary-case approach was the best interpretation of § 924(c)(3)(B) before Johnson and Dimaya. As discussed above, this Court must determine not what the most natural interpretation of § 924(c)(3)(B) is but instead whether it is "fairly possible" to interpret § 924(c)(3)(B) as employing the conduct-specific approach. St. Cyr, 533 U.S. at 300 (internal quotation marks omitted). Because the inquiry before this Court is materially different than the inquiry engaged in by the Fourth Circuit in Fuertes and McNeal, these cases do not foreclose the Court from adopting a conduct-specific approach to the residual clause.

he was convicted.[15] The Supreme Court has already provided at least a preliminary answer to this debate. According to the Court, "in ordinary speech words such as 'crime,' 'felony,' 'offense,' and the like sometimes refer to a generic crime, say, the crime of fraud or theft in general, and sometimes refer to the specific acts in which an offender engaged on a specific occasion, say, the fraud that the defendant planned and executed last month." Nijhawan v. Holder, 557 U.S. 29, 33-34 (2009) (emphasis in original). And, indeed, the Court has at least sometimes interpreted uses of the word "offense" in federal statutes to refer to the specific conduct in which a particular offender engaged. For example, in Nijhawan, the Court interpreted the monetary threshold requirement in 8 U.S.C. § 1101(a)(43)(M)(i), which defines an "aggravated felony" in part as "an offense that . . . involves fraud or deceit in which the loss to the victim or victims exceeds $10,000," to apply to "the specific circumstances surrounding an offender's commission of a

---

[15] The opinions in Dimaya also referenced this debate; however, in that case, the government had not asked the Court to reinterpret § 16(b) as incorporated into the INA to require a conduct-specific approach. See Dimaya, 138 S. Ct. at 1217 (plurality opinion). Accordingly, although Justices Thomas, Kennedy, and Alito, in dissent, argued that the Court should abandon the ordinary-case approach with respect to § 16(b), see id. at 1252 (Thomas, J., dissenting), a majority of the Court declined to do so, at least in part because the argument had not been presented to the Court, see id. at 1217 (plurality opinion) ("[T]he Government once again has not asked us to abandon the categorical approach in residual-clause cases. To the contrary, and as already noted, the Government has conceded at every step the correctness of that statutory construction." (internal quotation marks omitted)); id. at 1232 (Gorsuch, J., concurring in part and concurring in the judgment) ("I have proceeded on the premise that the Immigration and Nationality Act, as it incorporates § 16(b) of the criminal code, commands courts to determine the risk of violence attending the ordinary case of conviction for a particular crime. I have done so because no party before us has argued for a different way to read these statutes in combination; because our precedent seemingly requires this approach; and because the government itself has conceded (repeatedly) that the law compels it. But any more than that I would not venture." (citations omitted)). In addition, as discussed below, applying the conduct-specific approach in the context at issue in Dimaya would have raised practical and constitutional problems, which further reinforced the majority's view that it would be improper to abandon the ordinary-case approach in that case; however, these same concerns are not present in the context of § 924(c)(3)(B). Accordingly, although the Dimaya opinions discuss the choice between the conduct-specific and ordinary-case approaches to some degree, the tentative conclusions reached on that issue do not squarely answer the question presented here.

fraud and deceit crime on a specific occasion" rather than to apply "categorially, i.e., to only

those fraud and deceit crimes generically defined to include that threshold." Id. at 40; see also

United States v. Hayes, 555 U.S. 415, 426 (2009) (applying a conduct-specific, rather than a

categorical, approach to a prong of the definition of "misdemeanor crime of domestic violence"

that described "an offense . . . committed by a current or former spouse, parent, or guardian of

the victim").

      Courts have generally relied on the inclusion of the phrase "by its nature" to interpret

§ 924(c)(3)(B) and other similar residual clauses as requiring the ordinary-case approach[16];

however, this language does not foreclose the conduct-specific approach. Although the inclusion

of the phrase "by its nature" certainly focuses the Court on the inherent characteristics of the

"offense" in question, it does nothing to resolve the underlying question of whether the "offense"

in question is the generic crime or the specific crime. This conclusion is especially appropriate

considering the significant difference between a statute like § 924(c)(3)(B), which criminalizes

specific conduct, and statutes such as the ACCA residual clause and § 16(b) as incorporated into

the INA, which determine the impact of previous convictions (many of which may involve state

law) on later, separate proceedings such as federal sentencing proceedings in Johnson and

removal proceedings in Dimaya. Such collateral contexts present the two primary problems that

the Supreme Court confronted in interpreting those residual clauses to require the ordinary-case

approach. First, these contexts necessarily involved the "utter impracticability" of "accurately

reconstructing, often many years later, the conduct underlying a conviction." Dimaya, 138 S. Ct.

at 1218 (plurality opinion) (internal quotation marks and alterations omitted); see also

---

[16] For example, in Dimaya, the plurality opinion explained that "the words 'by its nature' in
§ 16(b)" make it "all the clearer" that the text, "[b]est read," "demands a categorical approach"
because an "offense's 'nature' means its 'normal and characteristic quality.'" Dimaya, 138 S. Ct.
at 1217 (plurality opinion) (quoting Webster's Third New International Dictionary 1507 (2002)).

Moncrieffe v. Holder, 569 U.S. 184, 200 (2013) ("The categorical approach serves 'practical' purposes: It promotes judicial and administrative efficiency by precluding the relitigation of past convictions in minitrials conducted long after the fact."). Second, the Court observed that the adoption of the categorical approach avoided "the Sixth Amendment concerns that would arise" from courts "making findings of fact that properly belong to juries." Dimaya, 138 S. Ct. at 1217 (plurality opinion) (quoting Descamps v. United States, 570 U.S. 254, 267 (2013)); see also Apprendi v. New Jersey, 530 U.S. 466, 490 (2002) ("Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.").[17] Indeed, as Justice Thomas explained, "the categorical approach was never really about the best reading of the text" but was instead adopted "to avoid a potential Sixth Amendment problem with sentencing judges conducting minitrials to determine a defendant's past conduct." Dimaya, 138 S. Ct. at 1256 (Thomas, J., dissenting).

These same concerns do not apply to § 924(c)(3)(B). In "§ 924(c) cases, the predicate offense and the § 924(c) offense are companion contemporaneous crimes, charged in the same indictment before the same federal judge." United States v. St. Hubert, 883 F.3d 1319, 1335 (11th Cir. 2018). Accordingly, in such cases, "the record of all necessary facts are before the federal district court as to both offenses." Id. (internal quotation marks and alteration omitted). Moreover, when a defendant in a § 924(c) case elects to proceed to trial, both the predicate "crime of violence" and the § 924(c) offense are before the fact-finder, which can evaluate the

---

[17] Although Dimaya involved § 16(b) as incorporated into the INA rather than as incorporated into a criminal statute, the plurality explained that "§ 16(b) is a criminal statute, with criminal sentencing consequences," and that it must be interpreted "consistently," whether it is encountered "in a criminal or noncriminal context." Dimaya, 138 S. Ct. at 1217 (plurality opinion) (internal quotation marks omitted).

underlying conduct and make a determination about whether that specific conduct involved the use of force or by its nature presented a substantial risk that the defendant would use force against the person or property of another in the course of committing the predicate offense. Therefore, with respect to § 924(c), there are no practical or constitutional difficulties with rejecting the ordinary-case approach in favor of a conduct-specific approach.

In sum, the text of § 924(c)(3)(B) can be fairly read to support either the ordinary-case or the conduct-specific approach; however, because applying the ordinary-case approach would give rise to the same serious constitutional problems that led the Supreme Court to strike down similar statutes in Johnson and Dimaya, the doctrine of constitutional avoidance compels the Court to reinterpret § 924(c)(3)(B) as adopting the conduct-specific approach. This conclusion is reinforced by the absence of the practical and constitutional problems that concerned the previous courts interpreting the residual clauses in § 924(e) and § 16(b). Accordingly, the Court interprets § 924(c) in relevant part to apply to the use or carrying of a firearm during and in relation to, or the possession of a firearm in furtherance of, the defendant's commission of any federal crime where the defendant's actual conduct, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.[18]

Turning to the question of whether Khan's specific conduct in committing the claimed predicate offenses meets this standard, the government's entire argument on this point is: "In this

---

[18] Although Khan does not specifically argue that adopting the conduct-specific approach would not avoid the constitutional problems identified in Dimaya, the Court observes that Dimaya makes clear that such an interpretation has no constitutional infirmity. See Dimaya, 138 S. Ct. at 1215-16 ("[W]e do not doubt the constitutionality of applying § 16(b)'s substantial risk standard to real-world conduct. The difficulty comes, in § 16's residual clause just as in [§ 924(e)'s], from applying such a standard to a judge-imagined abstraction—i.e., an idealized ordinary case of the crime." (internal quotation marks, citations, and alteration omitted)).

particular case, the better interpretation of Section 924(c)(3)(B) would be to permit this Court to

consider Khan's own real-world conduct in determining whether his offenses qualified as crimes

of violence. Based on the facts that this Court found 14 years ago, his offenses surely did." Gov't

Opp. 27.

Having reviewed the record, the Court disagrees. The primary conduct underlying Khan's

convictions on Counts 2, 4, and 5 involved his participation in various discussions and meetings

with individuals connected to the Center; his trip to Pakistan to train in the LET camps, where he

engaged in weapons training and military drills, including as part of that training firing an AK-47

rifle, a 12 mm anti-aircraft gun, and a rocket-propelled grenade at targets, but did not, as far as

the Court is aware, travel to the front lines or engage in active fire; and his contact with Pal

Singh to whom he sent an airplane control module and a compatible wireless video system.

Although all these various activities occurred at the periphery of—and, in some cases, with the

intent to support—violent actions undertaken by others, including co-conspirators and LET

members, there is insufficient evidence in this record that these actions involved either Khan's

actual use of force or a substantial risk that Khan would use force.[19] Based on the evidence

introduced at trial, the government has not shown that Khan, for example, traveled to the front

lines or any area of active combat, discharged a firearm in any context other than target practice,

or in any respect used force against the person or property of another. Accordingly, the Court

---

[19] Although Khan's specific conduct, particularly with respect to encouraging co-conspirators to travel to Pakistan, may have resulted in a substantial risk of these co-conspirators using violence, the Fourth Circuit has explained that the residual clause does not sweep so broadly. Instead, the "residual clause makes plain (for all its erstwhile murkiness) that the relevant inquiry is not whether there is a risk of any person using force in any way tangentially related to an on-going offense, but rather whether there is a substantial risk of the defendant doing so." Fuertes, 805 F.3d at 499 (emphasis in original). This portion of Fuertes survives any reinterpretation of the residual clause because it is based not on any feature of the ordinary-case approach but instead on the plain language of § 924(c)(3)(B) and, specifically, its limitation to force that is used "in the course of committing the offense."

finds that Khan's convictions on Counts 2, 4, and 5 do not constitute crimes of violence under either § 924(c)(3)(B) or § 924(o).

III.   CONCLUSION

For the reasons stated above, Khan's Motion to Vacate [Dkt. No. 849] will be granted and his convictions on Counts 11, 24, 25, and 27 will be vacated by an appropriate Order to be issued with this Memorandum Opinion.

Entered this 1st day of August, 2018.

/s/

Leonie M. Brinkema
United States District Judge

Alexandria, Virginia

32